**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHAUNTA M. RICHARDSON,<br><br>*Plaintiff*,<br><br>v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION,<br><br>*Defendant*. | Civil Action No. 24-2517 (SLS)<br>Judge Sparkle L. Sooknanan |

**MEMORANDUM OPINION**

In 2024, the National Railroad Passenger Corporation (Amtrak) terminated Shaunta Richardson from her position as a police officer. Ms. Richardson brought this lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the District of Columbia Human Rights Act, alleging that her termination was the result of racial discrimination and retaliation. Amtrak counters that it terminated Ms. Richardson because of two separate misconduct incidents, including one where Ms. Richardson repeatedly struck a customer in the face until he fell out of his wheelchair, bloodied. Because no reasonable jury could conclude that Amtrak's non-discriminatory and non-retaliatory reasons for Ms. Richardson's termination were pretextual, the Court grants summary judgment to Amtrak.

## BACKGROUND

### A. Factual Background

The Court draws the facts from the Parties' Statements of Material Facts and the underlying materials referenced in those statements. *See* Def.'s Statement of Undisputed Material Facts (DSOF), ECF No. 36–2; Pl.'s Statement of Disputed Material Facts (PSOF), ECF No. 37–1. The

Court assumes the facts in those statements to be true unless they have been specifically disputed, and it assumes the truth of other undisputed statements in the record. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[1]

### 1. Background and Alleged Discrimination

Ms. Richardson began working for Amtrak as a police officer in 2012. DSOF ¶ 1. For more than a decade, she served in multiple roles and received commendations for her work. DSOF ¶¶ 3, 4; Ex. O, at 28:12–29:22.[2] On January 5, 2023, Ms. Richardson filed a complaint with Sergeant Christopher Schabert about Captain Dawn Cook, who served at times as Ms. Richardson's direct supervisor. DSOF ¶ 47; Ex. I, at 26:3–6, 29:10–11. Ms. Richardson is African American and Captain Cook is white. Ex. 1, at 39:19–40:5. Ms. Richardson's complaint cited a "tense" conversation, during which Captain Cook accused Ms. Richardson of being "on the verge of

[1] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

Amtrak contends that Ms. Richardson's statement is flawed, speculative, and lacking citations to the record. *See* Reply 2–6. The Court agrees that Ms. Richardson's statement, which largely asks a series of rhetorical questions, is not a "concise statement of genuine issues" with "references to the parts of the record relied on to support the statement." LCvR 7(h)(1). But the statement does offer some guidance about the facts that she disputes, or at least "opposes[.]" PSOF 5. Therefore, when Ms. Richardson's statement reasonably "controvert[s]" a material fact, the Court will not deem it admitted. LCvR 7(h)(1). That said, "an assertion of fact properly presented in a movant's statement of material facts is not controverted when a non-movant supplies additional facts and factual context, that do not actually dispute the movant's asserted fact." *Toomer v. Mattis*, 266 F. Supp. 3d 184, 191 (D.D.C. 2017) (cleaned up). And a plaintiff's "subjective impressions and beliefs regarding their experiences . . . generally are insufficient to raise a genuine factual dispute requiring resolution at trial." *Burton v. D.C.*, 153 F. Supp. 3d 13, 24 (D.D.C. 2015), *aff'd sub nom. Nelson v. D.C.*, 689 F. App'x 642 (D.C. Cir. 2017).

[2] The Defendant's exhibits are numericized and attached to their Motion for Summary Judgment, ECF No. 36. The Plaintiff's exhibits are alphabetized and attached to her Opposition. ECF No. 37.

insubordination." DSOF ¶ 47; Ex. 23, at 3.[3] Ms. Richardson also claimed that Captain Cook had "utilized unprofessional tones and language" in the past. Ex. 23, at 3. For these reasons, she requested to work under a different supervisor going forward. *Id.* The complaint did not reference discrimination, retaliation, or any protected characteristics. DSOF ¶ 48. According to Ms. Richardson, Amtrak never investigated the complaint. PSOF 2.

Following her complaint, Ms. Richardson alleges that Captain Cook targeted her with a series of actions, though Amtrak presents an explanation for most of them.

- Ms. Richardson believes that Captain Cook approved docking her pay while she was on leave in February 2023 after hand surgery. DSOF ¶ 50. But Ms. Richardson admits that she was later paid for that time. *Id.*
- Ms. Richardson says that her seniority was changed when she transferred to the training unit. DSOF ¶ 51. This issue was also resolved. *Id.*
- Ms. Richardson claims that while her hand was injured, Captain Cook prohibited her from attending a California detail where she was supposed to teach a class. DSOF ¶ 52. But Ms. Richardson admits both that the class had a physical component, and that training or travel was not permitted with an injury. DSOF ¶ 52–53.
- Ms. Richardson says that she was forced to attend a different training course while injured, despite requesting that it be postponed. DSOF ¶ 54. But Ms. Richardson acknowledges that this training was mandatory and that the decision to require her attendance could have been made by someone other than Captain Cook. *Id.*

[3] The Court will use the page numbers from the ECF filings if they conflict with the pagination internal to each exhibit.

- Ms. Richardson complained of "coerced transfer of work assignments," referring to a single instance where Captain Cook gave her a last-minute assignment. DSOF ¶ 55.
- Ms. Richardson received a letter of instruction from Sergeant Schabert for five instances of tardiness. DSOF ¶¶ 56–57. But the letter itself states that it is not discipline. DSOF ¶ 56. And Ms. Richardson admits that it ultimately played no role in her termination. DSOF ¶ 57.
- Ms. Richardson claims that she was passed over for a promotion to sergeant. *Id.* Though she placed well on the sergeant's exam, a sergeant position was not available at the time, and there were no sergeant vacancies for which she applied or was denied. *Id.*; Ex. 1, at 286:8–287:9.

On March 27, 2023, Ms. Richardson filed a second complaint about Captain Cook, this time with Inspector Victor Green. DSOF ¶ 58; Ex. 26, at 2. Ms. Richardson explained that she had "expressed concerns about [Captain Cook's] tone, choice of words and her confrontational approach." DSOF ¶ 59; Ex. 26, at 2. She also raised some of the incidents described above, as well as certain "false allegations" that Ms. Richardson believed that Captain Cook anonymously filed regarding her holding secondary employment through a hair braiding business. Ex. 26, at 3.

Captain Cook later testified that she was never aware of any formal or informal complaint filed by Ms. Richardson. DSOF ¶ 60.

### 2. Incidents and Termination

The crux of this case focuses on two events—referred to by the Parties as the "Wheelchair Incident" and the "Hood Rat Incident"—that led to Ms. Richardson's termination. These incidents were captured on video, and the Court has reviewed the footage. Ex. 15; Ex. 21.

First, on November 7, 2023, Amtrak police officers responded to a call about a disorderly individual, Mr. Jones, who was sitting in his wheelchair at the train station ticket counter at Union

Station. DSOF ¶ 17; Ex. 15. A different officer's body camera footage captured the incident as Ms. Richardson arrived on the scene, walking up behind Mr. Jones. DSOF ¶ 18; Ex. 15. Ms. Richardson and Mr. Jones soon exchanged heated comments. Ms. Richardson stated to someone off camera, "I wish he would, I wish he would." DSOF ¶ 18. In response, Mr. Jones said, "what the f*** are you going to do about it." *Id.* Ms. Richardson then said, "try and see how your day turn out. I'm not them." *Id.* Next, Ms. Richardson—still standing behind Mr. Jones—pointed her right index finger towards Mr. Jones' face. DSOF ¶ 19. In response, Mr. Jones reached back in his wheelchair to grab or brush away Ms. Richardson's finger. DSOF ¶ 19; Ex. 15. Ms. Richardson then struck Mr. Jones three times in the face with a closed fist. DSOF ¶ 20. As other officers intervened, Mr. Jones fell out of his wheelchair and onto the floor of the station, bloodied. DSOF ¶¶ 20–21; Ex. 15. No other officers on the scene confronted Mr. Jones aggressively or initiated physical contact. *See* Ex. 15. Ms. Richardson later admitted that, in hindsight, she should have dealt with the situation differently. DSOF ¶ 22.

On February 9, 2024, an Amtrak Police Department Use of Force Panel met to review Ms. Richardson's actions. DSOF ¶ 23. Five voting members made up the panel: Deputy Chief Joseph Patterson, Inspector Joseph Gorman, Inspector Theodore McLaughlin, Captain Steven Angelo, and Sergeant Schabert.[4] DSOF ¶ 24. Captain Cook attended the meeting but was not a voting member. *Id.* The panel reviewed the body worn camera footage and concluded that Ms. Richardson's actions were not within departmental policy. DSOF ¶ 25; Ex. C, at 7:1–16:7, 32:23–33:11.

[4] The transcript from the use of force panel does not list Sergeant Schabert as a voting member of the panel. *See* Ex. C, at 2:20–3:3. However, since both parties agree that Sergeant Schabert was a voting member of the panel, *see* DSOF ¶ 24; PSOF 10, the Court will assume this fact as true.

The second incident occurred on January 25, 2024, as multiple Amtrak officers escorted a disorderly woman out of Union Station. DSOF ¶ 32; Ex. 21. The officers escorting the woman were silent. *See* Ex. 21. But Ms. Richardson followed from behind, yelling insults. DSOF ¶ 33; Ex. 21. For example, Ms. Richardson referred to the woman's shoes as "soggy ass Air Force ones" and called her a "hood rat." DSOF ¶ 33. Ms. Richardson later defined "hood rat" as someone who is behaving poorly or acting obnoxiously. DSOF ¶ 35. Amtrak's Chief of Police, Samuel Dotson, later testified that "hood rat" is a derogatory and inflammatory term that can refer to someone who lives in the ghetto, is poor, or is not dressed well. DSOF ¶ 36. Ms. Richardson continued to make demeaning comments to the woman after she was taken into custody. DSOF ¶ 37. For example, when Ms. Richardson was removing the woman's shoes, she said: "These are all beat up; what they like, 90 dollars?" *Id.* Ms. Richardson's comments continued throughout the entire interaction. *See* Ex. 21. No other officers on the scene engaged with the woman in the same manner. *See id.*

After the incident, Amtrak conducted an administrative investigation. DSOF ¶ 34. They found by a preponderance of the evidence that Ms. Richardson had violated numerous Amtrak policies, showed an extreme lack of professionalism, and unnecessarily exacerbated the situation. *Id.* Ms. Richardson later expressed embarrassment about her conduct and stated: "Looking at the video, in hindsight everything I did was wrong." DSOF ¶¶ 41, 43.

On March 13, 2024, Amtrak held a disciplinary conference addressing both incidents. DSOF ¶¶ 11, 27, 39. That same day, Amtrak terminated Ms. Richardson and dismissed her from service, effective immediately, for the use of force and code of conduct policy violations. DSOF ¶¶ 27, 39. Chief Dotson maintained the ultimate decision to terminate Ms. Richardson. DSOF ¶ 28. Ms. Richardson attended the final disciplinary conference. Ex. 1, at 310:9–312:1. But she contends

that she was not given an opportunity to be heard or otherwise present evidence during the salient decision-making steps. PSOF 11.

On March 25, 2024, Ms. Richardson filed a grievance and discipline appeal through the Fraternal Order of Police, Lodge #189, of which she was a member, seeking reinstatement and backpay.[5] DSOF ¶¶ 2, 29, 42. The Parties participated in two separate arbitrations. DSOF ¶ 13. As to the "Wheelchair Incident," the arbitrator ordered Ms. Richardson reinstated, finding that Amtrak lacked just cause to discharge her. DSOF ¶ 31; Ex. A, at 27. But the arbitrator denied her request for back pay and benefits. Ex. A, at 27. As to the "Hood Rat Incident," the arbitrator found that Amtrak had just cause to discipline Ms. Richardson but not to discharge her. DSOF ¶ 44; Ex. B, at 25. As a result, the arbitrator ordered Amtrak to convert the termination to an unpaid suspension without backpay. Ex. B, at 25. In February 2026, Amtrak reinstated Ms. Richardson without backpay. DSOF ¶ 45. So, it appears that she is currently serving as a police officer for Amtrak.

### B. Procedural Background

Ms. Richardson filed this lawsuit in August 2024, alleging six counts of racial discrimination and retaliation. *See* Compl. ¶¶ 97–177, ECF No. 1. Amtrak moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). Mot. Dismiss, ECF No. 9. This Court granted that motion in part and denied it in part, dismissing Ms. Richardson's claims for retaliation under Title VII and the D.C. Human Rights Act (DCHRA). *See Richardson v. Nat'l R.R. Passenger Corp.*, No. 24-cv-2517, 2025 WL 1568198 (D.D.C. June 3, 2025). Following discovery, Amtrak moved for summary judgment on the remaining claims for race discrimination under Title VII,

[5] The grievance also raised issues related to Amtrak's investigation of a third incident involving Ms. Richardson on August 27, 2023. DSOF ¶ 12. However, the Court agrees with Ms. Richardson that this incident is immaterial to the termination or retaliation issues in this case. PSOF 5.

Section 1981, and the DCHRA, and retaliation under Section 1981. Mot., ECF No. 36. This motion is fully briefed and ripe for review. *See* Opp'n, ECF No. 37; Reply, ECF No. 39.

**LEGAL STANDARDS**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat summary judgment, the nonmovant must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (cleaned up). In considering a motion for summary judgment, a court "may not make credibility determinations or otherwise weigh the evidence." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016). Instead, it must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* Summary judgment is appropriate only if, viewing the evidence in that light, the court concludes that no reasonable jury could find for the nonmovant. *See Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). Importantly, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

Amtrak asks the Court to grant summary judgment in its favor on Ms. Richardson's claims for race discrimination under Title VII, Section 1981, and the DCHRA, as well as her claim for retaliation under Section 1981. The Court agrees that summary judgment is warranted on all remaining claims. Ms. Richardson fails to identify record evidence from which a reasonable jury could conclude that Amtrak's proffered non-discriminatory and non-retaliatory reasons for her termination were pretextual.

### A. Statutory Background

Before diving into its analysis, the Court will review the legal standards governing discrimination and retaliation claims under Title VII, Section 1981, and the DCHRA.

"Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting 42 U.S.C. § 2000e–2(a)(1)). Section 1981 prohibits racial discrimination in the making and enforcement of contracts, guaranteeing all persons the same contractual rights as white citizens. *See* 42 U.S.C. § 1981(a). It also prohibits retaliation for opposing racial discrimination, providing that all persons shall have the same right "to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981; *see Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 69–70 (D.C. Cir. 2015). And the DCHRA prohibits employers in Washington, D.C. from discriminating against individuals on the basis of race in hiring, firing, compensation, or other terms and conditions of employment. *See* D.C. Code § 2-1402.11(a).

Though the statutory text varies, "[t]he burdens of persuasion and production for claims raised under [Section] 1981 or under the D.C. law are identical to those for claims alleging

discriminatory treatment in violation of Title VII." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553 (D.C. Cir. 1997). When it comes to retaliation, "[h]ere, too, the Title VII standard applies to Section 1981 retaliation claims." *Koné v. Staples, Inc.*, No. 24-cv-2420, 2025 WL 2097737, at *4 (D.D.C. July 25, 2025); *see also Harris*, 791 F.3d at 68–69 (applying the same standard to retaliation claims under Title VII and Section 1981). Therefore, the Title VII framework may be used as "a short-hand reference" when analyzing claims under Section 1981 and the DCHRA. *See Johnson v. Dong Moon Joo*, No. 01-cv-0004, 2006 WL 627154, at *19 (D.D.C. Mar. 12, 2006).

Title VII "[d]iscrimination and retaliation claims are subject to the familiar, burden-shifting framework" from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). Throughout this process, the ultimate burden of persuasion remains with the plaintiff. *See Jackson v. Gonzales*, 496 F.3d 703, 706 (D.C. Cir. 2007).

First, absent direct evidence of discrimination, a plaintiff must establish a prima facie case by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802. "To state a prima facie case of discrimination, a plaintiff must allege she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Walker*, 798 F.3d at 1091. Meanwhile, "[f]or a retaliation claim, the plaintiff must allege that she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct." *Id.* at 1091–92. Next, if a plaintiff establishes a prima facie case, "the burden shifts to the employer to identify the legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action." *Id.* at 1092. Finally, if the employer meets this burden, "the 'central question' at summary judgment becomes whether 'the employee produced sufficient evidence for

a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee.'" *Id.* (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). "If the Court answers that question in the affirmative, the employee survives summary judgment." *Regis v. Mullin*, No. 24-cv-2405, 2026 WL 2137987, at *4 (D.D.C. July 24, 2026).

Here, Amtrak first contests whether Ms. Richardson has established the existence of adverse employment actions beyond her termination. *See Wilson v. Noem*, No. 20-cv-100, 2025 WL 1000666, at *14 (D.D.C. Apr. 3, 2025) (explaining that courts should start by assessing "whether an adverse employment action has occurred at all"). Second, Amtrak contends that even if Ms. Richardson can establish a prima facie case of discrimination and/or retaliation, she cannot ultimately prevail because there are legitimate reasons for any adverse actions and the record evidence does not support a jury finding that those reasons were pretextual. The Court will address those arguments in turn.

### B. Adverse Employment Action

In the discrimination context, an adverse employment action is one that caused "some harm" with respect to "an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 354–55. Meanwhile, in the retaliation context, an adverse action is "not limited to discriminatory actions that affect the terms and conditions of employment," but can include any harm that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006).

Here, all Parties agree that Ms. Richardson's termination constitutes an adverse employment action. Mot. 1; Opp'n. 6; *see also Douglas v. Donovan*, 559 F.3d 549, 554 (D.C. Cir. 2009) (describing "termination" as an "obvious" adverse employment action). At the motion to

dismiss stage, the Court considered two additional adverse employment actions: denial of promotion opportunities and discriminatory discipline. *Richardson*, 2025 WL 1568198, at *5, *8. It is not clear whether Ms. Richardson is pressing claims based on these employment actions at this stage. In its motion, Amtrak argued that "other than the wrongful termination, none of Ms. Richardson's alleged adverse employment actions are, in fact, adverse actions." Mot. 12–14. Yet other than conclusory references to these being adverse actions, Ms. Richardson's opposition does not address this argument. Opp'n. 10 (stating that Captain Cook "took adverse employment actions" against Ms. Richardson); Opp'n. 11 (stating only that "Amtrak brushes off these incidents as not 'adverse employment decisions'" and otherwise focusing on Ms. Richardson's termination); *see Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."); *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("Mentioning an argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones is tantamount to failing to raise it." (cleaned up)). For the sake of completeness though, the Court will explain why these are not adverse employment actions.

Starting with Ms. Richardson's lack of promotion, she "admitted in deposition she never applied for any sergeant position, there was not even a sergeant position available at the applicable time, and she was never denied for any promotion." DSOF ¶ 57. So there was no employment action at all, and certainly not one that caused harm to "an identifiable term or condition" of Ms. Richardson's employment. *Muldrow*, 601 U.S. at 354–55.

The remaining alleged discipline—such as Ms. Richardson's pay being docked, her work schedule being changed amidst injury, or her letters related to tardiness—also do not qualify as adverse employment actions. At the motion to dismiss stage, the Court held that certain disciplinary steps could qualify as adverse employment actions at least to the extent that they served as a "building block" justifying her ultimate termination. *Richardson*, 2025 WL 1568198, at *5, *8. Now, Ms. Richardson rehashes this "series of smaller employment actions," without a single citation to legal authorities, presumably to show either that they are independently adverse or connected to her termination. *See* Opp'n 9–12. She is wrong.

The record reflects that much of the alleged discipline was ultimately reversed—for example, her docked pay was ultimately restored, and a dispute about her seniority was resolved. *See* DSOF ¶¶ 50–51. As a result, at this stage, these actions are not adverse at all. *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) ("An employer may cure an adverse employment action . . . before that action is the subject of litigation."). And Ms. Richardson fails to point to any harm that resulted from other actions, such as the mandatory trainings. *See* DSOF ¶¶ 53–55; *see also Mungin*, 116 F.3d at 1557 ("[C]hanges in assignments and work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes."); *Brown v. Paulson*, 597 F. Supp. 2d 67, 74 (D.D.C. 2009) ("The denial of a single training opportunity does not constitute a materially adverse action in the absence of a reduction in salary or grade[.]" (cleaned up)). Similarly, her supervisor "harbor[ing] a longstanding personal dislike" of her or "approach[ing]" her at a restaurant "to inquire why [she] did not like her" do not constitute adverse employment actions. Opp'n 12; *see Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (explaining that "not everything that makes an employee unhappy is an actionable adverse action." (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).

Finally, while certain disciplinary steps like letters of instruction may be adverse if they "serve[] as a building block that justifies an adverse action down the road," *Wilson*, 2025 WL 1000666, at *24 (cleaned up), Ms. Richardson now admits that "she was not terminated for any letter of instruction" and that they were "not discipline." DSOF ¶¶ 56–57. Indeed, her termination appears to be solely connected to the "Wheelchair Incident" and the "Hood Rat Incident."

All in all, none of the alleged discipline rises to the level of an adverse employment action. Therefore, the Court will consider only one adverse action—Ms. Richardson's termination—in evaluating both her discrimination and retaliation claims.

**C. Pretext**

Now to the "central question" in this case: whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory [or non-retaliatory] reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee[.]" *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (applying *Brady* to a retaliation claim). "A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker*, 798 F.3d at 1092 (citing *Brady*, 520 F.3d at 495 n.3). That said, "[s]howing pretext requires more than simply criticizing the employer's decision-making process." *Wilson*, 2025 WL 1000666, at *15; *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)

(explaining that a court "may not second-guess an employer's personnel decision absent demonstrably discriminatory or retaliatory motive" (cleaned up)).

**1. Discrimination**

Ms. Richardson's three discrimination claims require slightly different standards. Under Title VII and the DCHRA, Ms. Richardson must show only that her race was a motivating factor in her termination. *See Mawakana v. Bd. of Trs. of Univ. of the Dist. of Columbia*, 926 F.3d 859, 866 (D.C. Cir. 2019); *Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008). Under Section 1981, she must meet a higher standard and prove that, "but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). Here, Amtrak is entitled to summary judgment under either standard.

Ms. Richardson attacks Amtrak's explanation for her termination with a jumbled argument devoid of legal citations. (In fact, the argument section of her brief includes citations to only three cases, including one Fourth Amendment case.) The Court divines three arguments in support of Ms. Richardson's general claim that her termination was pretextual—none of which suffice.

*First*, for much of her brief, Ms. Richardson attempts to minimize the gravity of both incidents, seemingly to show that Amtrak's explanation for her termination was "inconsistent or dishonest[.]" *Walker*, 798 F.3d at 1092. For example, regarding the "Wheelchair Incident," she relies on an expert report stating that her use of force was "reasonable and necessary according to the Amtrak Police Department policy, her training, and the national standard." Opp'n 18; Ex. Q, at 2.[6] She also downplays the "Hood Rat Incident," admitting that while she "did engage in some

[6] Ms. Richardson points out that her expert also opined that her use of force was objectively reasonable under *Graham v. Connor*, 490 U.S. 386 (1989), a Fourth Amendment case. Opp'n 18. Whether Ms. Richardson's conduct was objectively reasonable under the Fourth Amendment is not relevant to the current disputes.

shouting of mild epithets," "a jury might well conclude . . . that the woman was simply out of control and hysterical most of the time," while Ms. Richardson had "a calm demeanor, thorough professionalism, and [used] a bit of humor[.]" Opp'n 27. Having viewed the video evidence of both incidents, this characterization of the facts strains credulity. In the "Wheelchair Incident," Ms. Richardson disturbingly punched a wheelchair-bound individual multiple times as he fell to the ground, bloodied. DSOF ¶¶ 20–21; Ex. 15. As for the "Hood Rat Incident," the Court questions how a police officer (or anyone) could exhibit "thorough professionalism" while "shouting . . . epithets[.]" Opp'n 27.

But even drawing all reasonable inferences in Ms. Richardson's favor, as the Court must, she cannot survive summary judgment simply by repeating that she should not have been fired for her actions. Rather, Ms. Richardson must "present[] enough evidence to allow a reasonable trier of fact to conclude that the 'employer's proffered explanation'"—that she was terminated because of the "Wheelchair Incident" and the "Hood Rat Incident"—"'is unworthy of credence[.]'" *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (quoting *Texas Dept. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)). In other words, in "[e]valuating an employer's asserted reason for a discharge," the Court must "ask not whether the employer was objectively correct in discharging the employee but instead whether 'the employer honestly believes in the reasons it offers.'" *Ball v. George Washington Univ.*, 798 F. App'x 654, 655 (D.C. Cir. 2020) (citing *Fischbach*, 86 F.3d at 1183).

Here, Ms. Richardson may reasonably disagree with the outcome of Amtrak's investigation. Indeed, an arbitrator reinstated Ms. Richardson's employment. But on this record, she does not raise a genuine dispute that Amtrak believed that her actions warranted termination for the use of force and code of conduct policy violations and terminated her for those reasons. *See*

*Ey v. Off. of Chief Admin. Officer of U.S. House of Representatives*, 967 F. Supp. 2d 337, 344 (D.D.C. 2013) ("[T]he plaintiff's own disagreement with his supervisors' view is certainly not sufficient to establish pretext or discrimination."). Tellingly, Ms. Richardson herself admitted that she should have dealt with both situations differently. DSOF ¶¶ 22, 43. Further, while an arbitrator overturned her termination under the just cause standard, the arbitrator left her suspension and denial of backpay in place. DSOF ¶¶ 31, 44; *see also Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 146 (D.D.C. 2005) (holding that arbitration decisions are not preclusive in Title VII cases but may be "accorded such weight as the court deems appropriate"). Given this, Ms. Richardson fails to show that Amtrak based her termination on an "error too obvious to be unintentional" such that a jury could surmise an "unlawful motive for doing so." *Fischbach*, 86 F.3d at 1183.

*Second*, Ms. Richardson suggests that Captain Cook hijacked her disciplinary process to achieve her discriminatory goals. In her telling, Captain Cook "wanted the Plaintiff gone, out of longstanding racial animus" and found herself "in a position to influence her allies and colleagues to make [the] Plaintiff's termination happen" once the "Wheelchair Incident" and "Hood Rat Incident" occurred. Opp'n 32–33. The key issue with this theory, though, is that Captain Cook neither voted on the use of force panel nor made the decision to terminate Ms. Richardson. DSOF ¶¶ 61, 62. Putting aside Ms. Richardson's beliefs about the role that Captain Cook played, the undisputed facts reflect that Chief Dotson made the final termination decision. DSOF ¶¶ 28, 62. Clearly, a reasonable jury could not find that Ms. Richardson's termination was pretext for impermissible discrimination if the person responsible for the alleged discrimination was not involved in her termination. *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079–80 (D.C. Cir. 1999) (granting summary judgment to the defendant when there was no evidence that the allegedly discriminatory employee influenced the decision to fire the plaintiff).

Though disjointed, Ms. Richardson seems to make three responsive arguments on this point, none of which prevail. To start, she states that while "Amtrak would like to limit the blame to only one person," Captain Cook is not the "only one" who discriminated against her. PSOF 14. However, she offers no explanation or evidence as to who else may have discriminated against her. The only other Amtrak employee who Ms. Richardson arguably identifies as a source of discrimination is Chief Dotson himself. Specifically, Ms. Richardson implies that because Chief Dotson was aware of the Amtrak Police Department's reputation and the importance of holding police officers accountable in diverse communities, he must have "decided to make an example of Plaintiff precisely because her race[.]" Opp'n 26. But this far-fetched theory—that a Police Chief's legitimate accountability concerns actually hide his racial bias—is the exact sort of "conclusory allegation[] and speculation" that the Court need not credit at summary judgment. *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014), *aff'd*, 818 F.3d 751 (D.C. Cir. 2016).

Next, Ms. Richardson minimizes Chief Dotson's role, stating that, "[t]echnically, both terminations were made final in the end by Amtrak Police Chief Samuel Dotson, but, as is readily apparent from the entire record, Chief Dotson acted, in both instances, after recommendations of termination by other senior officers[.]" Opp'n. 6–7. Though her argument again lacks any citation to case law, to the extent Ms. Richardson alleges a "cat's paw" theory of discrimination, this argument also fails. It is true that "evidence of a subordinate's bias is relevant where . . . the ultimate decisionmaker is not insulated from the subordinate's influence." *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1310 (D.C. Cir. 1998). But here, even if Captain Cook or someone else was motivated by racial animus—a claim for which Ms. Richardson has scant evidence—it is undisputed that Chief Dotson independently reviewed the body camera footage of both incidents

and made his own determination to terminate Ms. Richardson. DSOF ¶ 62. Ms. Richardson certainly has pointed to no record evidence suggesting otherwise.

Lastly, Ms. Richardson implies that Chief Dotson's termination decision was pretextual because it relied on an allegedly tainted use of force investigation convened after the "Wheelchair Incident." In general, this sort of argument can succeed if the plaintiff demonstrates that her employer's "investigation . . . [was] so unsystematic and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination[.]" *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015). Here, Ms. Richardson does not meet that high bar. Most of Ms. Richardson's allegations about the use of force panel are purely speculative. For example, Ms. Richardson implies that Captain Cook pressured Inspector McLaughlin to reverse his vote. Opp'n 21–22. But she offers no evidence on this point, even admitting in her opposition that Inspector McLaughin offered a fulsome explanation for his voting decisions in his deposition. Opp'n 22 n.1. In addition, Ms. Richardson alleges that instead of appointing a patrol sergeant to the use of force panel, as is required, Captain Cook instead appointed her direct report, Sergeant Schabert. *See* Opp'n 14–16. However, Ms. Richardson's opposition also concedes that this was not an irregular occurrence. As Deputy Chief Patterson explained, Sergeant Schabert was a constant member of the use of force panels, and previous panels similarly had no patrol sergeant present. *See* Opp'n 16; Ex. J, at 24:20–26:21.

The only issue on which there is a genuine dispute is whether Amtrak deviated from its typical procedures by not allowing Ms. Richardson and other witnesses the opportunity to interview or offer statements. *See* PSOF 11. But this issue did not make the panel "grossly defective[.]" *McCullough v. Whitaker*, No. 14-cv-296, 2019 WL 171404, at *7 (D.D.C. Jan. 8, 2019). After all, the panel still viewed the dispositive body worn camera footage and discussed

Ms. Richardson's actions. DSOF ¶ 25; Ex. C; *see also Dave v. D.C. Metro. Police Dep't*, 905 F. Supp. 2d 1, 16 (D.D.C. 2012) ("The fact that the investigation was short does not impugn its reasonableness."). Furthermore, Ms. Richardson does not raise a single procedural dispute with Amtrak's handling of the "Hood Rat Incident," for which she was also terminated. DSOF ¶ 39. In the end, Ms. Richardson fails to demonstrate that Amtrak's investigations leading to her termination were "so unsystematic and incomplete" that a factfinder could conclude that they were, in fact, motivated by a discriminatory purpose. *Burley*, 801 F.3d at 296. Given the reasonableness of the investigations—and Chief Dotson's undisputed role as the ultimate decisionmaker—Ms. Richardson's scattered criticisms of the investigations cannot support an inference that Amtrak's reasons for her termination were pretextual.

*Third*, Ms. Richardson attempts to establish pretext using a single comparator, Sergeant Kevin Dauphin. Opp'n 29–30. In one incident, after a disorderly person insulted Sergeant Dauphin, he allegedly repeated the insult verbatim—including an odious racial slur—to nearby officers to explain what had happened. DSOF ¶¶ 63, 65, 66; Ex. 27. An African American officer who heard Sergeant Dauphin repeating the insult filed a complaint, explaining why he was offended by a white superior officer quoting the epithet. DSOF ¶ 67; Ex. 27. Amtrak later concluded its investigation with a "not-sustained" status, and Chief Dotson did not punish Sergeant Dauphin. DSOF ¶ 68. Ex. L, at 51:14–18.

It is well accepted that plaintiffs lacking direct evidence of discrimination can still prevail by pointing to "evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances." *Brady*, 520 F.3d at 495. To do so, Ms. Richardson must demonstrate that "all of the relevant aspects of her employment situation were nearly identical to" the comparator employee. *Neuren v. Adduci, Mastriani, Meeks & Schill*,

43 F.3d 1507, 1514 (D.C. Cir. 1995) (quotation omitted). "Generally, '[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury,' but the court may decide that employees are not similarly situated as a matter of law if a reasonable jury would be unable to conclude based on the facts that the two employees were similarly situated." *Carter-Frost v. D.C.*, 305 F. Supp. 3d 60, 72 (D.D.C. 2018) (quoting *George v. Leavitt*, 407 F.3d 405, 414–15 (D.C. Cir. 2005)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301.

Here, Sergeant Dauphin is not a sufficiently similar comparator. Sergeant Dauphin was at a different rank and had a different supervisor. DSOF ¶ 64. Most importantly, though, Sergeant Dauphin's incident did not involve use of force and was not customer-facing at all. DSOF ¶ 69. His discipline was therefore assessed differently by Amtrak and Chief Dotson. Ex. L at 48:6–51:18; *see Burley*, 801 F.3d at 302 (holding that comparator evidence failed to defeat summary judgment where the plaintiff was "unable to demonstrate either that other white employees were found to have committed offenses of comparable seriousness, or that they were differently disciplined by the same supervisors"). Therefore, a reasonable jury could not conclude that Sergeant Dauphin was sufficiently similar to Ms. Richardson to serve as a comparator.

In conclusion, Ms. Richardson cannot show that Amtrak's non-discriminatory explanation for her firing was pretextual such that a reasonable jury could conclude that Amtrak actually acted with discriminatory intent. The Court therefore grants Amtrak's motion for summary judgment on Ms. Richardson's discrimination claims.

**2. Retaliation**

Next up is retaliation. "Generally, the methods a plaintiff can use to undermine an employer's asserted non-retaliatory reason for an adverse employment action are the same as the methods for showing a non-discriminatory reason was pretext." *Wilson*, 2025 WL 1000666, at *35. As a result, Ms. Richardson's retaliation claim fails for largely the same reasons as her discrimination claims.

Ms. Richardson's other arguments about retaliation—which, once again, are difficult to decipher—also fail. Specifically, she fails to show a causal relationship between her protected activity—namely, her complaints filed on January 5, 2023, and March 27, 2023—and her termination. "In the absence of direct evidence of retaliatory intent, a causal relationship between protected activity and adverse actions by an employer may be inferred through either temporal proximity or the existence of a pattern of antagonism." *Román v. Castro*, 149 F. Supp. 3d 157, 169 (D.D.C. 2016). First, temporal proximity is no help to Ms. Richardson, since "the connection must be 'very close.'" *Id.* (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Ms. Richardson filed her complaints roughly one year before her termination—far too long a gap to raise an inference of retaliation at summary judgment. *See, e.g.*, *Payne v. D.C. Gov't*, 722 F.3d 345, 354 (D.C. Cir. 2013) (concluding that the district court "rightly rejected" the theory that an eight-month gap was sufficiently close); *Adewole v. PSI Servs., Inc.*, 798 F. Supp. 2d 57, 65 (D.D.C. 2011) (holding that "[w]ithout more, a gap of six months between the plaintiff's protected activity and the challenged action is simply too long to create an inference of retaliation."). Next, although Ms. Richardson does not expressly invoke a causation theory based on a pattern of antagonism, such an argument would also fail. The "Wheelchair Incident" and "Hood Rat

Incident" are the undisputed causes of the termination—Ms. Richardson's other complaints did not even form the "building blocks" of her termination. *See supra*, at 13–14.

Furthermore, it is doubtful that the source of the alleged retaliation, Captain Cook, was even aware of Ms. Richardson's complaints. *See Jones*, 557 F.3d at 679 (explaining that to survive summary judgment, a plaintiff must at least offer "circumstantial evidence that could reasonably support an inference" that the allegedly retaliating supervisor had knowledge of the plaintiff's protected activity). For her part, Captain Cook says that she was unaware of either complaint. DSOF ¶ 60. Lacking contrary evidence, Ms. Richardson instead insinuates that Captain Cook would have been aware of the complaints because either (1) "her awareness should have been automatic had the complaints been investigated," or because (2) Ms. Richardson "corresponded in writing concerning these complaints with [Sergeant] Schabert, who reported to [Captain] Cook." Opp'n 11. But Ms. Richardson herself claims that her January 5, 2023, complaint was never investigated. PSOF 2. And Ms. Richardson points to no evidence explaining why Sergeant Schabert would have made Captain Cook aware of the complaints. Ms. Richardson's speculation, on its own, cannot defeat summary judgment.

In sum, Ms. Richardson has not identified sufficient evidence to create a material dispute on the ultimate issue of retaliation—"either directly by [showing] that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. As a result, Amtrak is entitled to summary judgment on her retaliation claim.

***

In closing, the Court notes the heavy emphasis Ms. Richardson places on her work record, including the various awards and commendations that she received over the course of her career.

The Court does not doubt Ms. Richardson's telling that she spent many years performing her duties admirably and was recognized for that service. But that says nothing about the two disturbing incidents that led to her termination—one that knocked a man out of his wheelchair and left him bloodied on the ground, and another that escalated a situation through persistent demeaning and derogatory comments. On the record before the Court, those are the incidents that led to Ms. Richardson's termination. And she has pointed to no evidence even suggesting that her termination was pretextual. Thus, there are no factual issues to be resolved by a factfinder and summary judgment is warranted.

## CONCLUSION

For the foregoing reasons, the Court grants Amtrak's motion for summary judgment. A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: September 14, 2026